May I please report, my name is Jack Siegel and I represent the appellant CNE Direct. Good morning, Mr. Siegel. May I please reserve three minutes for rebuttal? Yes. This case is a breach of contract case. You might want to move the microphone a little closer. Closer to myself? Yes. Yeah, if you could keep your voice up. Oh, I apologize, Your Honor. This is a breach of contract case. CNE alleges that Asset Recovery, a now defaulted defendant and Blackberry, breached a contract in November 2013 to provide CNE with mobile phone memory parts. Blackberry moved for summary judgment alleging that it was not a party to the contract, it wasn't involved in the transaction, and it is not bound by the actions of Asset Recovery because Asset Recovery was not its agent. My comments today are going to confine to the apparent authority issue. Actual authority is addressed in our briefs, and, of course, I'll answer any questions the Court has about actual authority. The Court should be reversed, and, of course, this Court is reviewing the Court's decision de novo, because the very first transaction that the parties entered into established or at least raised significant questions of fact as to the establishment of Asset Recovery as Blackberry's agent. And so that transaction occurred in June 2011. From June in 2011, then, we look at the course of dealing between the parties, and what you have is 15 transactions that follow virtually an identical pattern. And so the question then becomes, with CNE, could it reasonably rely on that initial establishment of Asset Recovery's authority in November of 2013? And then, finally, what I want to do if there's time is talk about the cases and explain how the fact patterns where summary judgment is granted do not in any way resemble this case, and that this Court should instead look to its decision in White's Farm Dairy, Inc., 433rd F. 2nd. 63, which is cited on page 20 of our brief. So the apparent authority is an estoppel concept. It's a question of fairness. It looks at the entire relationship of the parties and their course of dealings. It basically looks to see whether the principal has made a manifestation that a third party has authorized, whether that manifestation be by words, be by writing or conduct, and that other parties then rely on that manifestation. And if they're detrimentally harmed by their reliance, that the principal can't pull the plug out from underneath and walk away. Let's assume what you've just said to us so far about the initial course of dealing is correct, okay, that you at least create a factual issue on apparent authority. It seems to me that argument takes you very consistently up through September 2012 into October 2012. But then in 2012, October 2012, you get that e-mail. Your client gets that e-mail in which it says the LCD purchase is between Account Recovery and BlackBerry, and then it says your purchase is between C&E and Account Recovery. So I suggest you deal with Account Recovery. And then after that, say, I gather it's August of 2013, they actually require that you change the name of the supplier to AR. Why don't those two facts establish a new course of dealing that seems pretty unambiguous? Well, it actually has to be looked at in context. So if you look at the different interpretations of the e-mail exchange can be derived based on how much you credit C&E's testimony on that point that's in the record. So what C&E testified was in that entire time period, it was actually August and October of 2012 that I was having difficulties dealing with asset recovery. And it went to BlackBerry and said, hey, BlackBerry, is there anything you can do to help us out? And what they said was, no, you need to deal with asset recovery. But they said more than that. They said our purchase is between AR and BlackBerry. And then they said your purchase is between C&E and AR. Was that the only communication, those two e-mails? No, that wasn't the only communication. There were phone calls. Is there any evidence that C&E heard from BlackBerry that what was stated in that e-mail was not correct? Well, the subsequent purchase orders that happened after that phone conversation continued at BlackBerry as a supplier. But then they, before this transaction, said correct that as well. Yes, they said correct that as well. And the explanation we were given was because asset recovery was taking a larger role at BlackBerry. But that wasn't from BlackBerry, that communication. That's correct. That was from the agent. But if this court looks at the White Farm Dairy decision where the court reversed a directed verdict, the court in that case, there was an independent party who signed the contract with the plaintiff. The plaintiff sought to sue the manufacturer. It was a milking products. And the argument by the manufacturer was, I'm not on this contract anymore. And the district court granted a directed verdict and said, yeah, there's no privity. But this court reversed finding that a jury could look at the reality of the situation and not the form of the situation. So the reality was if you read the e-mails exchanged in the way BlackBerry wants them to be read as opposed to crediting all of the circumstances and seeing his own explanation of how those e-mails and what they were intended to mean, which was basically respect the chain of command here, you have to deal with asset recovery. How is it ambiguous? The LCD purchase is between account recovery, asset recovery, and RIM. Well, it's – The purchase is between them. It conflicts with the actual purchase orders that were in that time. It conflicts with the expectation that was established in June of 2011 and was confirmed with that. The question really is what would C of E reasonably believed when it received these communications? So what we're talking about, Your Honor, when we're asking these issues is reasonable reliance. So what I hear you saying is that after the October direct communication, the only thing you're left hanging onto is, oh, well, the purchase orders that AR is accepting still name BlackBerry. That's not the only thing. Well, what else happens after October of 2012? Well, what happens is during the phone conversations that are not in those e-mails that also have to be considered. So we can't just isolate the e-mails and pretend they exist in a vacuum. Are any of the phone conversations with BlackBerry? They are with BlackBerry, yes. Okay. And what statement in those phone conversations cuts back on the LCD purchases between AR and RAM? You must deal with BlackBerry. You have to continue to deal with BlackBerry. They are our exclusive person. You have to deal with them. They say you have to deal with AR, not BlackBerry. Correct. You have to deal with AR. That's correct. But doesn't that just go the other way? No, it doesn't, Your Honor. It doesn't go the other way. The e-mail in the context of the entire discussion is C of E saying, hey, we're having some problems. And they say, if they use the language that's imprecise, they weren't intending as laypeople to write e-mails thinking that a appellate court was going to review it later and say, well, they used the word the deal is with or that phrase, and that must concretely mean as a matter of law. Because there isn't a case that they cite where that kind of language or that kind of discussion, a single communication taken out of context of the entire course of dealing in the relationship up to that point in time, particularly when they continue to operate in the same way as they always had, even going forward, and the purchase orders continue to list BlackBerry as the supplier. There isn't a case that says that as a matter of law, a jury could not find that C and E's explanation of the events is believable. I mean, there is a principle in the restatement third of agency, section 303, comment B, that this court applied in the ophthalmic surgeons limited case 632F31. That restatement section says, I think it's apropos to your question or what you're asking, it basically says that once you have the first  burden on the principle to come forward and actually do something unequivocal. We're talking about a commercial transaction here. If after 20 invoices with no mention of any warranty, you put on an invoice that you sent 90-day warranty, the other side would be bound by that, right, under the battle of the forms if they just accepted that. Correct. Even if they didn't see it, that's just the way commercial transactions work. Correct. So when you're expressly told, they not only did it, but you saw it too, you yourself changed the name of the supplier on your purchase orders. Why don't we give that the same significance that we would give any other change in the forms that, in a commercial transaction, generally established terms of deal? I think for the reasons articulated in the White Farm Jury Decision, which said apparent authority is essentially the quintessential jury question, and these questions about the entirety of the course of dealings between the parties and all the circumstances need to be taken into account. And here, what I think is particularly, it's on 67 of the opinion, it says during the oral argument, defendant contended that this case is similar to one where a consumer purchases a car from a dealer. We disagree. That's exactly the analogy that BlackBerry makes. It's exactly the analogy that the district court made at the oral argument. In these circumstances, even if the jury believed that Brown was ordinarily an independent entity, it could find that, in this case, the defendant itself was, in fact, handling the deal. We, therefore, conclude that the trial court erred in directing a verdict for the defendant. So, and this is a particular case where there was a ordinary commercial transaction following exactly the way that you're saying, Your Honor, and we have documents that show a particular party is, that there's a transaction between one party and another party, and this court is saying, No. You can look at the reality of the transaction. You can look at the substance behind the form, and a jury should decide whether or not those emails, the subsequent changes in the purchase orders, were significantly material enough to alter C&E's reasonable expectation up and through November of 2013. And I think it's also critically important is that BlackBerry's position in this case has been that it has absolutely nothing to do with the November 2013 transaction, that asset recovery was always at arm's length with it, that there was a separate dealing between BlackBerry and asset recovery, and then asset recovery and C&E. But the affidavit of asset recovery's own principle, which we raised in our opening brief, and which wasn't rebutted in the BlackBerry's brief, he says that what he did in that November transaction was pass the bids back and forth, wait for BlackBerry to accept or reject the bids. May I finish my statement? Please. And then work to try to negotiate a deal between the two parties. That is directly contradictory with BlackBerry's position that it was standing wholly independent. And it's exactly these kinds of conflicts in the evidence that warrant a jury determination and a trial. Thank you, Your Honor.  Your Honor, may it please the Court, Sandra Remmes for BlackBerry. Again, we'll focus on the apparent authority argument. Your Honor pointed out two particular items that changed after the first transaction. In fact, there were a whole lot of factors that changed after the very first transaction, the 16 or 17 subsequent transactions, that negate any possibility, of course, of dealing here that would establish apparent authority. Your Honor did point out the August 13th change in the purchase orders. From that point on, the purchase orders, there were six of them for actual transactions that C&E prepared that said that assets recovery was the buyer, supplier. And, by the way, there's testimony in the record that we point to from their own witness that says, of course, if someone is listed as the supplier in a P.O., that means they're the seller. Then we have the four purchase orders in the very transactions that issued November 13th. There were two sets of two purchase orders. Again, C&E made them out. Again, made it out to assets recovery as the supplier, i.e., seller. No mention of BlackBerry. By the way, I do want to point out that the purchase orders that they're relying on pre-August 13th, there's no evidence they were even sent to BlackBerry. They were only sent to assets recovery. That's significant as well. Also, Your Honor pointed out the October 2012 email, the key one from Mr. Billings of BlackBerry that said, the purchase is between you, you being C&E, and assets recovery. Isn't that correct? And we don't get involved in that relationship. You couldn't be clearer. That is one of only about two or three communications at all since the first transaction. And, as we point out, they were all consistent in the same direction. BlackBerry says, we don't get involved. You deal with them. And, of course, the reason they did was BlackBerry, with respect to the customer relationship between C&E and assets recovery, and, in fact, not trying to get involved, precisely because assets recovery is not its agent. Now, there were no other, counsel pointed out some vague series of communications, there were no other communications. That's the fact, there were no other communications. Indeed, that's why, when everything blew up on November 27th, 2013, and C&E's CEO, Mr. Latham, sent an email, he was frantically emailing back and forth with the melee of assets recovery, and then he sent an email to BlackBerry, and BlackBerry, again, didn't respond. Consistently, it's not their relationship. Now, what else changed after the first transaction? Of course, those two facts are enough to indicate any sense, of course, of dealing that would establish apparent authority. But what else changed? So, every payment, every payment made after the first transaction by C&E was made directly to asset recovery. Never paid BlackBerry after the first transaction. Okay, what else? You have other series of communications, either from C&E or to C&E, that indicated C&E darn well knew that its relationship was with assets recovery, was purchasing from asset recovery. You have Mr. Tejeda of C&E telling Mr. Mealy of asset recovery, by order is with you, you be asset recovery. Not them. Not BlackBerry. Black, and there are other emails that we cite too, Mr. Tejeda knew asset recovery was selling to C&E at a markup. Again, that's totally inconsistent with sense of agency. If, in fact, as we know was the case, demonstrated by many transactions that are in the record, asset recovery would purchase from BlackBerry and markup at whatever percentage it could get. Some were 10%, some up to 50%, and BlackBerry didn't know that. BlackBerry didn't care. Again, that's because asset recovery was acting on its own account. Asset recovery told C&E that it was financially at risk in transactions and it had already paid for goods, again, showing that it was acting on its own account. And then, as if it wasn't clear enough, in October 2013, this is a month before the transaction issue, and this is in the record at 1030, asset recovery sends an email that C&E had and produced. It clearly defines the relationship of the parties saying, assets recovery ordered the parts from BlackBerry. The sales order was paid by assets recovery by wire. That's the BlackBerry. I, as asset recovery, sold the parts. I sold the parts to C&E direct, and they are sending the director to pick up the parts. That pretty much defines it. And apart from that, of course, we have various factors that didn't change. Negotiations were always between asset recovery and C&E. BlackBerry never inserted itself. I do want to then – that reminds me to address the White's Farm case, which they rely on. Well, the White's Farm case, if you look at that, there the supplier and the manufacturer, Brown, basically ran the show, and they inserted themselves into the transaction with the plaintiff with White's Farm, which was the purchaser, and then they brought in a dealer to paper it up. But the manufacturer, Brown, that's the punitive principle there, they negotiated the deal with the plaintiff, with the ultimate purchaser. They negotiated the discount. They got involved in installing the equipment. They got involved in training the plaintiff. And they only brought in – they brought in the middle man there, the dealer, essentially to paper it up. That's absolutely opposite of what happened here. And that's why there was an issue of fact here, and there's no issue of fact here. When you get to the November 2013 transaction at issue, if that's the way you looked at it, there would be no basis – well, there's no basis anyway, but there's no connection with BlackBerry at all on the fact that BlackBerry had these parts available that it put out to market to Asset Recovery and others, and Asset Recovery then tried to do a deal with C&E and then tried to – if that were successful, then it would purchase the goods from BlackBerry. Of course, as we know, that didn't happen. But the point is BlackBerry – the documentation was all between Asset Recovery, C&E, not a word about BlackBerry. And when they tried dragging BlackBerry at the last minute, BlackBerry said, uh-uh, we're not involved, it's not our deal. You said that Asset Recovery told C&E that Asset Recovery was at financial risk in the transactions? Yes, there's emails that affect – let's see. I believe if you look at 1,022, 1,024, and 1,028 in the record, and also Tejeda – there's an indication within those as well that Tejeda knew that Asset Recovery was selling to C&E at marked-up prices. Of course, you have lots of testimonies. So selling at marked-up prices doesn't mean it was at financial risk? Right, I'm sorry, there are two points. Yes, yes. And I guess I would just conclude here that this case – the district court got it right. The district court – I understand it's a noble review. The district court took a very close view of the record and concluded that there is no genuine issue of material fact here. It did not weigh credibility. It looked at what really are the undisputed facts. It's primarily based on documentation here. And, hell, the only reasonable inference that a jury could draw from the evidence is that there's no genuine issue of fact concerning agency, and the record it holds does not support a conclusion of apparent authority. I would submit respectfully, Your Honor, if Rule 36 is going to have any meaning in commercial cases, summary judgment should be granted here. If the district court's decision were reversed here, that would mean that any third party, like C&E here, who has a dispute with a broker, with a middleman, distributor, like Asset Recovery, could claim that the middleman is an agent of the original supplier or manufacturer, like BlackBerry, and drag that supplier all the way to trial. I mean, any time a supplier places some merchandise in the stream of commerce through a chain of distribution, including a middleman, which is frankly the way our economy works here, that supplier is at risk of getting sued and going to trial under contract. We're not talking product liability. We're just talking about a contract dispute between the middleman and his buyer, and it should not be the case on this type of record with so flimsy evidence that the supplier, in this case BlackBerry, would have to face trial. And fortunately, Rule 36 enables, of course, to dispose of such claims where the evidence of agency is as lacking as it is here. If there are no further questions, I again respectfully request that the Court affirm the District Court's grant of summary judgment. Thank you. Your Honors, the question of whether or not C&E's reasonable reliance and whether there was a break in the chain of reasonable reliance is a fundamental question of fact. That's what the cases say. I did not hear BlackBerry cite to a single case that's dispositive on facts similar to this case because there isn't any. The email that when I was up and discussing with the Court actually has a reply email, which kind of more puts into context what C&E's response during its communications in August 2013. Please understand this is C&E speaking. If you want to continue dealing exclusively through him, meaning asset recovery, as he constantly says, I respect that, but we need to resolve this issue. I'm not looking to circumvent Stephen for commercial purposes. So the way the emails can be read, the emails that a jury might, if they decide BlackBerry is right, when they weigh the evidence, which is what we should not be doing under Rule 56 motion, could find that that's enough to break the causal chain, in order to break the chain of reasonable reliance. Or it could credit Mr. Tejeda's response in the testimony from Mr. Tejeda that those communications were all about figuring out and respecting the chain of command that BlackBerry had established. What manufacturers don't have to worry about is if they don't blur the lines, if they don't hold somebody out like BlackBerry did with asset recovery, don't go through a number of transactions which leave it questionable whether or not C&E could continue to rely on asset recovery, then they don't have to worry about being dragged into court and having a jury trial. But here, I think we can all agree that they established asset recovery as having apparent authority. And then the question then becomes, is the jury going to credit the explanations of BlackBerry or not? Are they going to read an email strictly and in isolation from the other evidence in the record or not? That's up to the jury to decide, and that's for another day. The question is whether we have evidence here to support each and every element of our claim and whether the facts give rise to a genuine issue of material fact. Resolved in a light most favorable to C&E, the answer has to be yes. The changing of the payment structure, the changing of the POs, the POs were changed because asset recovery gave an explanation to C&E. At no point does BlackBerry come forward and say, hey, unequivocally, as there are cases where this happens, and particularly BlackBerry is a large company with a legal department, writing a letter, asset recovery is not our agent. Because I think everybody could have recognized after that first initial transaction, that's exactly, when a jury could credit, that's exactly the scenario and context that BlackBerry was establishing. And for these reasons and those stated in our brief, I respectfully request that the court reverse summary judgment. Thank you.